**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| GARY W. CRUICKSHANK, Chapter 7 Trustee of the Estate of Blast Fitness Group, LLC, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 20-CV-10196-AK |
| v. | ) | |
| | ) | |
| HAROLD R. DIXON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON CAPECAPITAL IRVING, LLC, CAPECAPITAL MARYLAND HEIGHTS, LLC, AND CAPECAPITAL WEST HARTFORD, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**ANGEL KELLEY, D.J.**

Plaintiff Gary Cruickshank ("the Trustee"), the Chapter 7 trustee of the estate of Blast Fitness Group, LLC ("BFG"), initiated this adversarial proceeding against multiple defendants in January 2018.  Before the Court is Defendants CapeCapital Irving, LLC, CapeCapital Maryland Heights, LLC, and CapeCapital West Hartford, LLC's (collectively, "Defendants") Motion for Partial Summary Judgment. [Dkt. 81].  The Motion revolves around Defendants' acquisition of three properties from a transaction between Blast Fitness Acquisitions LLC ("Blast Acquisitions"), BFG, and Bally Total Fitness Corporation ("Bally").  The Trustee alleges that these acquisitions constitute fraudulent transfers under Massachusetts Uniform Fraudulent Transfer Act ("MUFTA"), Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 5(a)(1), and 6(a).  For the following reasons, Defendants' Motion for Partial Summary Judgment [Dkt. 81] is **DENIED**.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.  BFG is a company that was formed by Harold Dixon ("Dixon") and Stephen[1] Borghi ("Borghi") in February 2011. [Dkt. 84-1 at 3].  The initial members of BFG were Borghi and Auburndale Fitness Group Investment, LLC ("Auburndale Fitness").  Auburndale Fitness had majority ownership of BFG at all times relevant to this lawsuit.  BFG's initial managers were Borghi and CapeCapital, LLC ("CapeCapital").  At all times relevant to this lawsuit, Dixon was the manager of Auburndale Fitness and CapeCapital.

In April 2012, Blast Acquisitions, a wholly owned subsidiary of BFG, entered into an Asset Purchase Agreement ("the Bally Agreement") with Bally.  Under the Agreement, Blast Acquisitions received, inter alia, thirty-nine fitness facilities and the revenue from closed clubs.  The agreement also provided for the purchase of "the Owned Real Property," which referred to three pieces of property owned by Bally—2715 North Belt Line Road, Irving, Texas ("the Texas Property"); 12703 Dorsett Road, Maryland Heights, Missouri ("the Missouri Property"); and 1031 New Britain Avenue, West Hartford, Connecticut ("the Connecticut Property," collectively, "the Properties").  According to the Bally Agreement, "Sellers [Bally] shall sell, transfer, and assign to Purchaser [Blast Acquisition], and Purchaser [Blast Acquisition] shall purchase, acquire, and accept from Sellers [Bally] . . . the Owned Real Property, provided that the Owned Real Property shall be sold pursuant to the terms of a separate purchase agreement . . . to an entity identified by Parent [BFG] prior to Closing." [Dkt. 84-1 at 287].

On April 25, 2012, Defendants CapeCapital Irving, LLC, CapeCapital Maryland Heights, LLC, and CapeCapital West Hartford, LLC were formed.  The Trustee alleges that Defendants

---

[1] In the parties exhibits, Borghi's first name is also spelled as "Steven."

were formed by Dixon.  By a deed dated April 30, 2012, Bally conveyed the Texas Property to CapeCapital Irving, LLC, and the deed was recorded on May 7, 2012.  By a deed dated April 26, 2012, Bally conveyed the Missouri Property to CapeCapital Maryland Heights, LLC, and the deed was recorded on May 4, 2012.  By a deed dated April 26, 2012, Bally conveyed the Connecticut Property to CapeCapital West Hartford, LLC, and the deed was recorded on May 3, 2012.

As provided by the Trustee, the separate purchase agreements between Bally and Defendants state, "[t]he Closing Date shall be on April 30, 2012, contingent upon Seller [Bally] and Buyer [Blast Acquisitions] closing on the [Bally Agreement]," and  "[t]he obligations of each party under this [real estate purchase] Agreement are contingent upon the completion of the closing contemplated under the terms and conditions of the [Bally Agreement]." [Dkts. 90-1 at 16, 27, 44, 55; 90-5 at 28, 33].

The parties disagree about the negotiating process for the Bally Agreement.  According to Defendants, BFG did not have the money to purchase the clubs or the Properties.  Instead of BFG providing all of the funds, Dixon, through the Dixon Family Limited Partnership, of which he was general partner, agreed to contribute $5 million to the Bally deal.  This contribution was purportedly contingent upon the Properties being sold to entities which Dixon controlled. Defendants allege that Dixon required that the Properties would not be owned by BFG or a Blast subsidiary, and Bally agreed with this demand.  It was allegedly with this understanding that Bally, BFG, and Blast Acquisitions entered into the Agreement.

According to the Trustee, on April 27, 2012, the members of BFG (Borghi and Auburndale Fitness), and CapeCapital as manager of BFG, approved the admission of the Dixon Family Limited Partnership into BFG, whereby the Dixon Family Limited Partnership purchased

preferred membership interests in BFG for $4 million.  In the Trustee's telling, the $4 million was used to finance the transaction, and Borghi and Dixon had an understanding that the entity taking title to the Bally Properties would be wholly owned by BFG.  Finally, the Trustee submitted an expert report by James M.  Kazmier, CPA/ABV, ASA, from CohnReznick LLP, ("the Kazmier Report") indicating that BFG was insolvent at the Bally Transactions' closing date, on April 30, 2012.  Defendants submit their own expert report by Stephen B. Darr, CPA, of Rubin and Rudman LLP, ("the Darr Report"), which identifies potential errors in the Trustee's expert reports, including the Kazmier Report.  With that factual background laid, the Court will move to the legal arguments.

## II.      LEGAL STANDARD

Defendants seek summary judgment on three counts of fraudulent transfer against them. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  Courts must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001).  All reasonable inferences from the record must be draw "in the light most

4

favorable to the non-moving parties." <u>Est. of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010) (citing <u>Houlton Citizens' Coal. v. Town of Houlton</u>, 175 F.3d 178, 183-84 (1st Cir. 1999)). A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." <u>Paul</u>, 948 F.3d at 49 (citation omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57 (1986).

## III.   DISCUSSION

Defendants present two arguments in support of their Motion for Partial Summary Judgment. First, they allege that the Properties were not "transferred" as required under MUFTA. Second, they argue that BFG was neither insolvent at the time of the transfer nor made insolvent by the transfer, as required under MUFTA Section 6(a). The Court will take each argument in turn.

### A.   "Transfer" Under MUFTA

The Trustee alleges that Defendants violated MUFTA Section 6(a), 5(a), and 5(b). Under all three provisions, a debtor must make a "transfer" or incur an "obligation" that is fraudulent. Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 5(a)(1), 6(a). In turn, a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Mass. Gen. Laws ch. 109A § 2. Under this broad definition, "[t]he essence of a transfer is the relinquishment of a valuable property right." <u>Connolly Geaney Ablitt & Willard, PC</u>, 614 B.R. 133, 152 (B.A.P. 1st Cir. 2020) (quoting <u>Giernum v. Glick (In Re Glick)</u>, 568 B.R. 634, 672 (Bankr. N.D. Ill. 2017)).

Defendants allege that BFG did not "transfer" anything of value to the Defendants because BFG never had an interest in the Properties.  Defendants shift responsibility for the transfer from BFG to Dixon by alleging that Dixon negotiated the Asset Purchase Agreement with Bally, chose Defendants as purchasers, and contributed $5 million to the deal.  Under this logic, "[BFG's] 'property interest' in the Bally Real Estate existed only on paper." [Dkt. 82].

However, that "paper" is a binding contract—the Asset Purchase Agreement—at the center of this lawsuit.  According to the Bally Agreement, "Sellers [Bally] shall sell, transfer, and assign to Purchaser [Blast Acquisition], and Purchaser [Blast Acquisition] shall purchase, acquire, and accept from Sellers [Bally] . . . the Owned Real Property, *provided* that the Owned Real Property shall be sold pursuant to the terms of a separate purchase agreement . . . to an entity identified by Parent [BFG] prior to Closing." [Dkt. 84-1 at 287].  In short, BFG could identify the Properties' purchasers, even though its wholly owned subsidiary, Blast Acquisition, was the "Purchaser."

Through this agreement, BFG obtained an interest in the Properties by negotiating and obtaining the right to assign a buyer.  This right gave BFG control over the Properties.  BFG could have assigned itself as the buyer, but instead indirectly "part[ed] with" the Properties by assigning Defendants as the purchasers.

An analogous circumstance was addressed in Lassman v. Simpson (In re Simpson), Nos. 02-11044-RS, 04-1214, 2007 Bankr. LEXIS 4218, at *22 (Bankr. D. Mass. Dec. 17, 2007). There, the debtor entered into an agreement that gave him the right to assign the mortgage against two properties. Id.  The debtor's assignment of the mortgage to a third-party was a "mode of disposing of an interest in property," because "[t]he mortgage rights were available to [the debtor]," and he assigned them to a third-party. Id.  Similarly, BFG had the right to assign the

6

Properties' purchaser, and he assigned them to a third-party.  Accordingly, the assignment was a transfer.

Although Defendants argue that BFG had no role in the negotiations, Dixon had control over BFG, and the evidence is ambiguous as to whether Dixon was acting in his role as general partner of the Dixon Family Limited Partnership, owner of Blast Acquisitions, or on behalf of BFG during the negotiations.  For the purposes of this motion, the Court must interpret this ambiguity in the Trustee's favor and assume Dixon was acting on behalf of BFG.  Further, the Trustee presents evidence, in the form of draft term sheets between BFG and Bally, that BFG had a role in the negotiations and was not merely a bystander.  Accordingly, the Trustee presents sufficient evidence to rebut Defendants' argument.

### B.    Insolvency

Next, the Court will turn to Defendants' insolvency arguments.  To constitute a fraudulent transfer under Section 6(a), the debtor must be "insolvent at that time or [become] insolvent as a result of the transfer or obligation." Mass. Gen. Laws ch. 109A, § 6(a).  Relying upon MUFTA Section 7(1)(i), the Trustee argues that the transfer occurred when the deeds were recorded, in May 2012.  Based upon the Trustee's Kazmier Report, BFG was insolvent on April 30, 2012, before the deeds were recorded.  Defendants, relying upon MUFTA Section 7(3), argue the transfer occurred when BFG identified Defendants as purchasers, before the closing.

Under MUFTA Section 7:

(1)    a transfer is made:
      (i)    with respect to an asset that is real property[,] . . . including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law

7

> permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee; . . .
>
> (3)    if applicable law does not permit the transfer to be perfected as provided in paragraph (1), the transfer is made when it becomes effective between the debtor and the transferee[.]

Mass. Gen. Laws ch. 109A § 7.

Here, the asset being transferred is real property. Therefore, Section 7(1)(i) applies. Section 7(3) does not apply because applicable law "permit[s] the transfer to be perfected as provided in paragraph (1)." Id. For the transfer of real estate, Section 7(1)(i) is met when a deed is recorded. See In re Pilavis, 233 B.R. 1, 9 (Bankr. D. Mass. 1999) (holding a transfer of property was effective on the date of recordation). Recordation for the Properties occurred on May 3, 4, and 7, 2012. The Trustee presents the Kazmier Report as proof that BFG was insolvent on April 30, 2012. In opposition, Defendants present the Darr Report. However, while the Darr Report documents potential errors in the Kazmier Report, it does not make any affirmative claims about the health of BFG's business. As the Court must read the facts in the Trustee's favor, the Trustee presents sufficient evidence that BFG was insolvent at the time of the transfer.

Even if Section 7(1)(i) was not applicable, the transfer did not "become[] effective" until April 30, 2012. This is because the separate purchase agreements had a closing date of April 30, 2012, and were "contingent upon the completion of the closing contemplated under the terms and conditions of the [Bally Agreement]." [Dkts. 90-1 at 16, 27, 44, 55; 90-5 at 28, 33]. Accordingly, Defendants' purchase of the Properties did not occur until the Bally Agreement's April 30, 2012 closing date. As the Trustee presents evidence that BFG was insolvent at the time of the transfer, Defendants' insolvency argument is unpersuasive.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants CapeCapital Irving, LLC, CapeCapital Maryland

Heights, LLC, and CapeCapital West Hartford, LLC's Motion for Partial Summary Judgment

[Dkt. 81] is **DENIED**.

**SO ORDERED.**

Dated: August 6, 2026                                   /s/ Angel Kelley
                                                        Hon. Angel Kelley
                                                        United States District Judge

9