UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GARY W. CRUICKSHANK, Chapter 7 Trustee of the Estate of Blast Fitness Group, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HAROLD R. DIXON, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Civil Action No. 20-CV-10196-AK <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## <u>MEMORANDUM AND ORDER ON PLAINTIFF'S</u>
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**ANGEL KELLEY, D.J.**

Plaintiff Gary Cruickshank ("the Trustee"), the Chapter 7 trustee of the estate of Blast

Fitness Group, LLC ("BFG"), initiated this adversarial proceeding against multiple defendants in

January 2018.  Before the Court is the Trustee's Motion for Partial Summary Judgment against

Defendants Harold R. Dixon ("Dixon"), CapeCapital Irving, LLC, CapeCapital Maryland

Heights, LLC, CapeCapital West Hartford, LLC, and Newfit LLC (collectively, "Defendants").

[Dkt. 86].  The Trustee alleges that Defendants' acquisition of various assets from two

transactions constitutes fraudulent transfers with actual intent under Massachusetts Uniform

Fraudulent Transfer Act ("MUFTA"), Mass. Gen. Laws ch. 109A, § 5(a)(1).  For the following

reasons, the Trustee's Motion for Partial Summary Judgment [Dkt. 86] is **GRANTED IN PART**

and **DENIED IN PART**.

1

I.     BACKGROUND

In evaluating this Motion, the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits the parties have submitted.  Unless otherwise noted, the facts below are undisputed.

This case revolves around two transactions.  The first was between BFG, Blast Fitness Acquisitions, LLC ("Blast Acquisitions"), and Bally ("the Bally Transaction").  The second was between BFG and Newfit ("the Newfit Transaction").[1]  The Court will first detail the Bally Transaction, then will move to the Newfit Transaction.

A.  The Bally Transaction

BFG is a limited liability company established by Stephen[2] Borghi ("Borghi") and Dixon. [Dkt. 96 ¶ 49].  Borghi and Auburndale Fitness Group Investment, LLC ("Auburndale Fitness") were initial members of BFG. [Id. ¶¶ 1-2].  Auburndale Fitness had majority ownership of BFG at all times relevant to this lawsuit. [Id. ¶ 6].  BFG's initial managers were Borghi and CapeCapital, LLC ("CapeCapital"). [Id. ¶ 3].  At all times relevant to this lawsuit, Dixon was the manager of Auburndale Fitness and CapeCapital. [Id. ¶ 4].  A Dixon associate, Frank Hennessey ("Hennessey"), owned a minority interest in Auburndale Fitness and became actively involved in Borghi's and Dixon's efforts to open new health clubs around the time that BFG was established. [Id. ¶ 51].

In April 2012, Blast Acquisitions, a wholly owned subsidiary of BFG, entered into an Asset Purchase Agreement ("the Bally Agreement") with Bally. [Id. ¶ 121].  Under the Bally Agreement, Blast Acquisitions received thirty-nine fitness clubs, the revenue from some closed

---

[1] As discussed in greater depth later, one of the Trustee's expert reports indicates that the Newfit Transaction was actually two transactions.
[2] In the parties exhibits, Borghi's first name is also spelled as "Steven."

Bally clubs, and millions of dollars in lease liabilities. [Dkts. 90-8; 96 ¶ 121].  The Bally

Agreement also provided for the purchase of three pieces of property owned by Bally—2715

North Belt Line Road, Irving, Texas; 12703 Dorsett Road, Maryland Heights, Missouri; and

1031 New Britain Avenue, West Hartford, Connecticut ("the Bally Properties"). [Dkt. 90-8].

According to the Agreement, "Sellers [Bally] shall sell, transfer[,] and assign to Purchaser [Blast

Acquisitions], and Purchaser [Blast Acquisitions] shall purchase, acquire, and accept from

Sellers [Bally] . . . the Owned Real Property [Bally Properties], *provided* that the Owned Real

Property shall be sold pursuant to the terms of a separate purchase agreement . . . to an entity

identified by Parent [BFG] prior to Closing." [Dkt. 90-8].  The Bally Agreement's closing date

was April 30, 2012.

BFG identified Defendants CapeCapital Irving, LLC, CapeCapital Maryland Heights,

LLC, and CapeCapital West Hartford, LLC (collectively, "Cape Real Estate Entities") as

purchasers for the Blast Properties.  These companies were formed by Dixon on April 25, 2012,

and Dixon retained control of the Cape Real Estate Entities at all relevant times. [Dkt. 90-1].  In

negotiations for the Bally Properties, Dixon made it clear that he wanted to be able to own the

Bally Properties through any of his entities, not just BFG subsidiaries. [Dkt. 96 ¶¶ 26, 104

("I . . . want to be able to own RE [real estate] in any entoity[sic].")].

The Bally Agreement's aggregate purchase price was $7.25 million, with $6.25 million

allocated for non-real estate assets and $1 million for real estate assets. [Id. ¶ 121-22].  Dixon

initially allocated $5 million for real estate assets but unilaterally decreased that allocation to $1

million during the negotiations. [Id. ¶ 109, 111, 113, 114, 122].  At closing, Blast Acquisitions

received thirty-nine clubs, which the Trustee alleges were worth less than nothing. [Id. ¶ 147].

Blast Acquisitions also received closed club revenue, a diminishing revenue stream worth less

than $1 million. [Id. ¶ 148]. Though the exact timing is disputed, the Cape Real Estate Entities purchased the Bally Properties for a total of $1 million. Relying upon expert reports, the Trustee alleges that the Bally Properties were worth $9.2 million. [Id. ¶ 143-46]. Based upon the Bally Properties' cost at resale, Defendants contend that the Properties were worth less than $2.535 million. [Dkt. 103 ¶ 143-146].

The parties disagree about how the funds for the Bally Agreement were acquired. According to Defendants, BFG lacked the funds to pay for the Bally Transaction on its own. [Dkt. 96 ¶ 12]. Therefore, Dixon, through the Dixon Family Limited Partnership ("the Dixon Partnership"), of which he was general partner, agreed to contribute $5 million to the Bally Transaction.[3] This contribution was purportedly contingent upon the Bally Properties being sold to entities which Dixon controlled. [Id. ¶ 22]. Defendants allege that Dixon required the Bally Properties to be owned by entities other than BFG or a BFG subsidiary, and that Bally agreed to this demand. [Id. ¶ 27]. It was allegedly with this understanding that Bally, BFG, and Blast Acquisitions entered into the Bally Agreement. [Id. ¶ 28].

According to the Trustee, on April 27, 2012, the members of BFG (Borghi and Auburndale Fitness), and CapeCapital as manager of BFG, approved the admission of the Dixon Partnership into BFG, whereby the Dixon Partnership purchased preferred membership interests in BFG for $4 million. [Id. ¶ 132]. According to the Trustee, the $4 million was used to finance the transaction, and Borghi and Dixon had an understanding that the entity taking title to the Bally Properties would be wholly owned by BFG. [Id.]. The Trustee also alleges that Blast

---

[3] In their Statement of Material Facts, Defendants allege that the Dixon Partnership contributed $5 million to BFG. [Dkt. 96 ¶ 22]. But, in their opposition to the Trustee's Motion for Partial Summary Judgment, Defendants allege that the Partnership contributed $4 million to the deal. [Dkt. 95 at 11]. Defendants have not presented any evidence to support the $5 million figure. The Trustee submitted a Written Consent Agreement which states that the Partnership contributed $4 million. [Dkt. 90-1]. Accordingly, the Court accepts as true the $4 million figure for the remainder of this opinion.

Acquisitions was able to raise $1.5 million for the deal from a third-party, ABC Financial Services Inc. [Id. ¶ 12]. Finally, the Trustee submitted an expert report by James M. Kazmier, CPA/ABV, ASA, from CohnReznick LLP, ("the Kazmier Report") indicating that BFG was insolvent at the Bally Transactions' closing date, on April 30, 2012. [Dkt. 90-13]. Defendants submitted their own expert report ("the Darr Report"), by Stephen B. Darr, CPA, of Rubin and Rudman LLP, which identifies potential errors in the Trustee's expert reports, including the Kazmier Report. [Dkt. 97-1].

During negotiations for the Bally Transaction, BFG was under the threat of a lawsuit from the owner of a competing fitness company and Borghi's old business partner, Elizabeth Beninati ("Beninati"). BFG's attorneys knew that Beninati may sue BFG in October 2011. [See Dkt. 96 ¶ 70]. On March 6, 2012, Dixon attended a mediation with Beninati and Borghi concerning Beninati's potential claims against Dixon and BFG. [Id. ¶ 102]. Less than a month after the Bally Transaction closed, on May 24, 2012, Beninati filed a lawsuit against Borghi and Dixon. [Id. ¶ 155]. On June 18, 2012, Beninati filed her Amended Complaint, which added BFG as a defendant and brought claims against the company for conversion, derivative claims for conversion, civil conspiracy, derivative claims for conspiracy, unfair trade practices in violation of Massachusetts General Laws Chapter 93A, unfair competition, derivative claims for unfair competition, and constructive trust. [Dkts. 96 ¶ 156; 90-17].

**B. The Newfit Transaction**

On February 12, 2013, Newfit was formed. [Dkt. 103 ¶ 175]. CapeCapital owned 92.5% of Newfit while Hennessey, Dixon's business associate, owned 7.5%. [Id.]. In a document dated January 30, 2013, BFG allegedly transferred 13 clubs ("the Newfit Clubs") to Newfit for

$3,391,000. [Dkt. 96 ¶ 176].[4]  According to the Trustee, the Newfit Clubs included BFG's more

profitable clubs. [Id. ¶ 187].  Under this theory, the Newfit Transaction left BFG with its least

profitable clubs and protected its more profitable clubs from collection in the Beninati lawsuit.

The Trustee alleges that the Newfit Clubs were worth $7.02 million at the time of the Newfit

Transaction. [Id. ¶ 177].  Defendants' Darr Report points out shortcomings of the Trustee's

expert reports but does not affirmatively allege the Newfit Clubs' value. [Dkt. 97-1].  The

Trustee also alleges that BFG's interest in four New England clubs was transferred to Newfit but

does not provide a date for this transfer or explain whether this was part of the Newfit

Transaction. [Dkt. 96 ¶ 62].

The evidence regarding the Newfit Transaction is also complicated by the presence of

LexFit.  LexFit is an entity, created between December 2012 and February 2013 and controlled

by CapeCapital. [Id. ¶ 61].  The Trustee's statement of facts refers to LexFit but does not explain

its role in the current controversy. [Id.].  LexFit is also discussed in the Kazmier Report [Dkt. 90-

13 at 8-11] and a second expert report from the Trustee [Dkt. 90-4 at 14].  According to the

Trustee's experts, on January 30, 2013, BFG transferred eight clubs to Newfit for $2,571,000

and Lexfit transferred five clubs to Newfit for $820,000. [Dkts. 90-13 at 10-11; 90-4 at 17].

These reports conflict with the parties undisputed factual allegation that BFG transferred 13

clubs to Newfit for a payment of $3,391,000. [Dkt. 96 ¶ 176].

## C. Procedural History

On January 26, 2018, the Trustee commenced the present adversarial proceeding by filing

a thirty-count Complaint against fifty defendants. [Dkt. 1].  The case was automatically referred

---

[4] The Trustee's Statement of Material Facts also implies that the Newfit Transaction occurred at some point in
February. [Dkt. 96 ¶ 182 ("Blast made its last rental payments to CapeCapital LLC in February 2013,
the same month of the Newfit transaction.")].

to the Bankruptcy Court pursuant to Local Rule 201 and 28 U.S.C. § 157(a). [Id.].  On April 4, 2018, the Trustee amended his Complaint. [Id.].  The Amended Complaint also contained thirty counts but reduced the total number of defendants to forty-nine. [Id.].  Many of the defendants filed motions to dismiss, and, over several months at the start of 2019, the Bankruptcy Court issued eight opinions on the motions. [Id.].  In those orders, the Bankruptcy Court dismissed nine defendants and several counts against the remaining defendants. [Id.].  On September 30, 2019, the Trustee filed his Second Amended Complaint, which also contained thirty counts and further reduced the total number of defendants to thirty-nine. [Id.].

On January 30, 2020, Defendants filed a Motion to Withdraw Reference to the Bankruptcy Court. [Id.].  The Motion to Withdraw Reference was stayed pending completion of pre-trial discovery in the Bankruptcy Court. [Dkt. 8].  After completion of discovery, the Court granted the Motion to Withdraw Reference on September 19, 2024. [Dkt. 21].  On January 17, 2025, Dixon, CapeCapital, the Dixon Partnership, the Real Estate Entities, and Newfit filed Motions for Summary Judgment. [Dkts. 30, 32, 33, 35, 37].  On May 21, 2025, the Trustee filed a Motion for Partial Summary Judgment. [Dkt. 63].  Those Motions for Summary Judgment were terminated on June 16, 2025, subject to refiling, after the parties represented their intention to pursue private mediation. [Dkt. 70].

On September 17, 2025, the parties filed a joint status report, which laid out a proposed schedule for their renewed Motions for Summary Judgment. [Dkt. 74].  Pursuant to that schedule, the parties would file rounds of related Motions for Partial Summary Judgment.  The Court adopted the parties' proposed schedule on October 7, 2025. [Dkt. 75].  The Court presently addresses the first round of Motions, all raising the issue of fraudulent transfer.  CapeCapital, the Cape Real Estate Entities, and the Trustee filed Motions for Partial Summary Judgment. [Dkts.

77, 81, 86].  CapeCapital and the Cape Real Estate Entities' Motions for Summary Judgment are addressed in separate orders.  Before the Court is the Trustee's Motion for Partial Summary Judgment. [Dkt. 86].

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020).  Courts must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001).

Although all reasonable inferences from the record must be drawn in the light most favorable to the non-moving parties, the non-moving party still bears the burden of placing at least one material fact into dispute after the movant offers evidence of the absence of a genuine issue. Darr v. Muratore, 8 F.3d 854, 859 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." Id. at 256-57.  Summary judgment

8

may be appropriate "in cases where elusive concepts such as motive or intent are at issue, . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); see also Dow v. United Bhd. of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993) ("Brash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment.").

A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted).  Submissions of evidentiary quality include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." See Fed. R. Civ. P. 56(c)(1)(A).  This extends to affidavits "containing relevant information of which [a party] has first-hand knowledge, [which] may be self-serving, but [are] nonetheless competent to support or defeat summary judgment." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) (quoting Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997)).

## III.   DISCUSSION

### A.  Procedural Objection

As a threshold issue, Defendants argue that the Trustee's Motion for Partial Summary Judgment should be denied because it is procedurally improper.  The Trustee filed his Motion as a "Cross-Motion" on November 24, 2025, but moved against parties who did not move for summary judgment, Dixon and Newfit. [Dkt. 86].  Because the Trustee's Motion was against non-moving parties, Defendants argue it was due by the October 24, 2025 dispositive motion

deadline. [Dkt. 74 (setting October 24, 2025 deadline)].  According to Defendants, the Motion was filed late and should be denied.

Because Defendants have not identified any prejudice and had a full opportunity to defend themselves, including an opportunity to amend incomplete responses to the Trustee's statement of material facts, the Court will address the Trustee's allegations against Dixon and Newfit.  The Trustee is nevertheless reminded to fully comply with the Court's orders in the future, including scheduling orders.

**B.  Fraudulent Transfer Standard**

The Trustee seeks summary judgment against Defendants on Count V, which alleges violations of MUFTA Section 5(a)(1).  The Court will, therefore, start with the applicable statute. Under Section 5(a)(1):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer[5] was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>      (1) with actual intent to hinder, delay, or defraud any creditor of the debtor.

When determining whether a transfer was made with actual intent under Section 5(a)(1):

> consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

---

[5] Defendants allege that the Cape Real Estate Entities' acquisition of the Bally Properties was not a "transfer" under MUFTA.  The Court has already addressed and rejected Defendants' arguments on that issue in its order denying the Cape Real Estate Entities Motion for Partial Summary Judgment. [Dkt. 110].

Mass. Gen. Laws ch. 109A § 5(b).

Because "[i]t is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors," courts "frequently infer fraudulent intent from the circumstances surrounding the transfer." Max Sugarman Funeral Home, Inc. v. A.D.B. Invs., 926 F.2d 1248, 1254 (1st Cir. 1991). While "[t]he presence of a single badge of fraud may spur mere suspicion, . . . the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Id. at 1254-55 (quoting In re Cushman Bakery, 526 F.2d 23, 33 (1st Cir. 1975)).

Due to the difficulty of presenting proof of intent, the First Circuit has advised caution when disposing of a state of mind issue on summary judgment. See Metro. Life Ins. Co. v. Ditmore, 729 F.2d 1, 5 (1st Cir. 1984) ("State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind.") (quoting Hahn v. Sargent, 523 F.2d 461, 468 (1st Cir. 1975)). Further, "[n]othing in § 5 . . . suggests that the presence of some combination of [the Section 5(b)] factors, or even all of them, compels a finding of fraud; the factors are simply those that may be considered." Baker Tanks, Inc. v. C&B Constr. Mgmt. Tr., Inc., 2008 Mass. App. Div. 113, 2008 WL 2200259, at *3 (Mass. Dist. Ct. App. Div. May 22, 2008).

Nonetheless, the motion for summary judgment standard still governs. Where a defendant fails to submit affirmative evidence rebutting an allegation of fraudulent transfer with actual intent, courts find in the plaintiff's favor. Bank of New York Mellon as Tr. for Certificateholders of SWABS, Inc., Asset-Backed Certificate, Series 2004-7 v. Lezdey, No. 13-CV-11118, 2019 WL 7578478, at *9 (D. Mass. Feb. 28, 2019), report and recommendation adopted, No. 13-CV-11118, 2019 WL 7578392 (D. Mass. Nov. 26, 2019) (finding actual intent

of fraudulent transfer on summary judgment); F.D.I.C. v. Anchor Props., 13 F.3d 27, 32 (1st Cir. 1994) (same); In re Chiang, 562 B.R. 559, 577 (Bankr. D. Mass. 2016) (same).

### C. The Bally Transaction

The Trustee alleges that the Bally Transaction contains six badges of fraud.  The Court will start with the Trustee's unrebutted allegations, then will move to the challenged allegations. First, the Trustee alleges that the transfer was to an insider because Dixon (1) controlled and owned a majority interest in BFG, through Auburndale, and (2) owned and controlled the Cape Real Estate Entities.  According to MUFTA Section 2, a debtor is a person liable on a claim.  If the debtor is an individual, an "insider" includes "a corporation of which the debtor is a director, officer, or person in control." Mass. Gen. Laws ch. 109A, § 2.  Here, BFG transferred the right to buy the Bally Properties to the Cape Real Estate Entities.  Dixon had control over both BFG and the Cape Real Estate Entities.  Therefore, this was a transfer to an insider.

Second, before the Bally Transaction was made, BFG was threatened with a lawsuit. BFG's attorneys knew that Beninati may sue BFG in October 2011, and Dixon knew that Beninati was likely to sue.  In fact, Beninati and Dixon engaged in mediation in March 2012.  In April 2012, BFG transferred the Bally Properties, and, less than a month after the Bally Transaction, Beninati indeed filed suit against BFG.  The record supports these contentions, and Defendants do not contest this factor.  Accordingly, the Bally Transaction satisfies another factor.

Third, the Trustee alleges that BFG retained possession or control of the Bally Properties after the Bally Transaction, because BFG continued to occupy the Bally Properties.  In support, the Trustee presents evidence that BFG paid CapeCapital to occupy the Bally Properties. However, reading the facts in Defendants' favor, paying rent, alone, does not establish that BFG

12

retained control of the Bally Properties.  The Trustee did not present any evidence regarding BFG's rights as a tenant or demonstrating that BFG occupied the building at all.  Accordingly, the Trustee has not established that BFG retained possession or control of the Bally Properties.

The Court now moves to the badges of fraud that are contested.  As a fourth badge of fraud, relying upon the Kazmier Report, the Trustee alleges that the Bally Transaction was substantially all of BFG's assets.  Although the Bally Properties were only sold for $1 million, according to the Trustee, they were worth $9.2 million.  Defendants contest this valuation.  They argue that the Bally Properties were worth significantly less than $9.2 million because the Properties were sold for a total of $2.535 million, in December 2013, June 2014, and December 2014. [Dkts. 96-100, 96-102, 96-104].  Even if the Trustee is correct about the Bally Properties' valuation, $9.2 million was not "substantially all" of BFG's assets on April 30, 2012.  According to the Kazmier Report, BFG's total assets in April 2012 were $18.4 million, well over the Trustee's alleged value of the Bally Properties. [Dkt. 90-13 at 15].  Therefore, the Trustee has not demonstrated that BFG transferred substantially all of its assets.

Fifth, the Trustee alleges that the value of the consideration received by BFG for the Cape Real Estate Entities was not of reasonably equivalent value.  The Trustee alleges that the Bally Properties were worth $9.2 million, but the Cape Real Estate Entities only paid a total of $1 million for the properties.  Defendants argue that consideration was roughly equivalent because Dixon gave $4 million to the Bally Transaction through his family partnership.  This misses the point.  The transfer was between BFG and the Cape Real Estate Entities, not between BFG and the Dixon Partnership.  There is no evidence that the Cape Real Estate Entities transferred any funds, let alone $4 million, to BFG.[6]  Accordingly, the transfer was for less than

---

[6] Defendants' conflation of the Dixon Partnership with the Cape Real Estate Entities further undermines their arguments, as it evinces Defendants' treatment of all Dixon-controlled entities as interchangeable.

13

reasonably equivalent value. See In re Oliver, 38 B.R. 407, 411 (Bankr. D. Mass. 1984) (transfer was made for less than equivalent value where "the debtor gave up substantial rights in the property by the transfer and received nothing of value in return").

Finally, the Trustee alleges that BFG was insolvent or became insolvent shortly after the Bally Transaction, relying upon the Kazmier Report. In opposition, Defendants present the Darr Report. However, while the Darr Report documents potential errors in the Kazmier Report, it does not make any affirmative claims about BFG's business. For example, Defendants' expert notes that closed club revenues were calculated with a "discount rate [that] may not be appropriate and is potentially overstated," without presenting evidence about an appropriate discount rate or completing an alternative analysis. [Dkt. 97-1 at 9]. To defeat a motion for summary judgment, the non-moving party must present "affirmative evidence" to rebut the moving parties' evidence. Anderson, 477 U.S. at 257. Defendants' expert report does not present such affirmative evidence. Thus, the Trustee established that the transfer occurred when BFG was insolvent.

In opposition, Defendants also argue that BFG's assets were enhanced by the Bally Transaction, because BFG gained thirty-nine clubs and $4 million from the Dixon Partnership. However, the $4 million from the Dixon Partnership was immediately spent on those thirty-nine clubs. Therefore, BFG did not gain both the $4 million and the thirty-nine clubs in the Bally Transaction. Additionally, the Trustee presented unrebutted evidence that the thirty-nine clubs

and closed club revenue were of limited value,[7] and that the Bally Transaction required BFG to take on $70 million in new lease liabilities. [Dkt. 87 at 11].

Defendants also argue that BFG believed that the thirty-nine clubs would be profitable because Bally recently sold 170 clubs at an average of $895,000 per club. [Dkt 96 ¶ 230]. Based upon this prior sale, BFG believed that the thirty-nine clubs it purchased were worth significantly more than the $125,000 per club that Blast Acquisitions paid. [Id.]. The prior Bally sale was to a different company, and the clubs were in different markets than the clubs in the Bally Transaction. Given these important distinctions, Defendants do not point to any specific evidence to support their belief that the clubs were worth more than $125,000 per club. Evidence is also lacking to support Dixon's belief that "Bally would never have permitted the real estate to be owned separately" if the clubs were worthless. [Dkt. 97-1 ¶ 5]. A non-moving party must present "affirmative evidence" to rebut the moving parties' evidence, Anderson, 477 U.S. at 257, and "unsupported speculation" is not sufficient to defeat summary judgment, Medina-Munoz, 896 F.2d at 8. Thus, Defendants have not rebutted the Trustee's contention that the thirty-nine clubs were of limited value.

In their defense, Defendants submit that BFG transferred the Bally Properties, not because they sought to avoid collection, but because BFG was not in the business of owning or managing property. [Dkt. 103 ¶ 132]. Defendants' assertion makes the Bally Transaction more suspicious, not less. If BFG was not in the business of owning or managing property, query why Dixon negotiated for and insisted that the Bally Properties be included in the Bally Transaction.

---

[7] In their response to the Trustee's Statement of Material Facts, Defendants dispute the Trustee's contention that "Blast received 39 clubs that had a combined value that was less than zero," and point to Defendant's exhibit 19 pages 4-8 in support of their dispute. [Dkt. 96 ¶ 147]. However, neither Defendants' nor the Trustee's exhibit 19 address the valuation of the Bally clubs. [Dkts. 90-3 (Trustee's exhibit); 97-1 (Defendants' exhibit)]. Accordingly, Defendant has not rebutted the Trustee's evidence.

In oral argument, when asked why the Bally Properties were included in the Bally Transaction when BFG was not in the business of owning or managing real estate, defense counsel provided no explanation.

In contrast, the Trustee has presented uncontroverted evidence that Dixon unilaterally reduced the allocation of funds for the Bally Properties from $5 million to $1 million, insisted on his ability to identify any one of his entities as the purchasers, and transferred the Bally Properties to entities he controlled.  In a conversation with Blast's attorney via email, on April 10, 2012, Dixon made it clear that he was considering the interaction between the Bally Transaction and the impending Beninati lawsuit.  There, Dixon stated, "I need to be flexible on ownership [of the Bally Properties] since I am solving another matter in parallel regarding steve [sic] Borghi and his old partners." [Dkt. 96 ¶ 116].  Dixon continued, "I may carve out new england assets from steve's ownership or for the time being have it owned by another entity which steve doesn't own." [Id.].  Bally's attorney responded, explaining that Blast Acquisitions had been formed that morning as a wholly owned subsidiary of BFG. [Id. ¶ 117].  In reply, Dixon stated, "[p]lease confirm that I am manager of new entity as well as authorized signature person.  Should I change member to something other than Blast fitness to strenghen [sic] position vs risk we discussed this am?" [Id. ¶ 118].  These emails demonstrate that Dixon was concerned about the risk of exposing the Bally Properties to collection.

Without evidence to dispute Trustee's submission, only one reasonable conclusion can be drawn from the record.  BFG included the Bally Properties because Dixon wanted to transfer that

16

real estate to entities which he owned and controlled at a reduced price, to avoid collection in the lawsuit from Borghi's former business partner, Beninati.

The Trustee has presented evidence that the Bally Transaction was (1) between insiders and (2) completed after BFG was threatened with litigation, (3) that BFG was insolvent at the time of the Bally Transaction, and (4) that insufficient consideration was provided for the Bally Properties.  While "[t]he presence of a single badge of fraud may spur mere suspicion, . . . the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Max Sugarman, 926 F.2d at 1254-55 (quoting In re Cushman Bakery, 526 F.2d at 33).  The Trustee has done much more than establish "a single badge of fraud." Id. at 1254.  He has mounted significant undisputed evidence of fraudulent intent in the Bally Transaction.  In opposition, Defendants have not presented "significantly clear evidence of a legitimate supervening purpose." Id. at 1255.  Accordingly, taking the full record into consideration, the Trustee has established that the Bally Transaction was fraudulent with actual intent.

### D.  The Newfit Transaction

Next, the Court moves to the Newfit Transaction in which BFG allegedly transferred its most profitable clubs to Newfit to avoid collection by Beninati.  As with the Bally Transaction, the Trustee alleges that the Newfit Transaction has six badges of fraud.  The Trustee relies upon unrebutted evidence that (1) the transfer was made from BFG which is controlled by Dixon to Newfit, which is owned and controlled by Dixon; (2) BFG retained possession and control of the Newfit locations because the gyms continued to be operated as "Blast Gyms," and BFG continued to manage the staff at the gyms; and (3) before the Newfit Transaction, on June 18, 2012, BFG was sued by Beninati.  Defendants dispute the Trustee's allegations that (4) the

17

Newfit Clubs constituted substantially all of BFG's assets; (5) BFG was insolvent at the time of the transfer; and (6) BFG did not receive reasonably equivalent value for the transferred clubs.

Defendants' objection to BFG's insolvency is unsuccessful for the reasons laid out above regarding BFG's financial condition at the time of the Bally Transaction.  However, because the Newfit Clubs' sales price is unclear, the Trustee has not presented evidence to support his claims that BFG did not receive reasonably equivalent value for the Newfit Clubs or that the Newfit Clubs were substantially all of BFG's assets.  The Trustee alleges that 13 clubs were sold for $3.39 million in his Motion [Dkt. 87 at 8], but these facts do not appear in the Trustee's Statement of Material Facts [Dkt. 96].  Furthermore, two of the Trustee's expert reports note that the 13 clubs were transferred in two different transactions, one between BFG and Newfit, and one between Lexfit and Newfit. [Dkts. 90-13 at 10-11; 90-4].  The Trustee does not explain Lexfit's role in the Newfit Transaction.  As several pivotal facts are missing from the Trustee's allegations, it is not appropriate to decide whether the Newfit Transaction was fraudulent on a motion for summary judgment.

Additionally, Defendants present evidence of a non-fraudulent reason for the transfer. According to Defendants, at the time of the Newfit Transaction, BFG needed liquid funds quickly.  Dixon could not contribute more money to BFG without expanding his share in the company.  Simultaneously, Borghi did not want his shares to fall below 30% and did not have funds to contribute to BFG. [Dkt. 96 ¶¶ 160, 179].  To get more cash from Dixon, without decreasing Borghi's share, Dixon created Newfit.  Newfit could then purchase clubs, providing BFG with money without diluting Borghi's share.  In their depositions, Dixon and Tom Moran (BFG's Director of Finance) explained that Newfit was created to allow BFG to raise capital

through club sales, without impacting Borghi's share of the company.  Hennessey explicitly says that the Newfit Transaction was meant for that purpose.

The Trustee presents conflicting evidence of fraudulent intent from Borghi's deposition transcript. [Dkt. 90-9 at 46].  In Borghi's deposition, Trustee's counsel asked whether "part of the reason Mr. Dixon told [Borghi] that clubs were being transferred was to protect them from being reached or attached by the plaintiffs in Beninati . . . ." [Id. at 53].  In response, Borghi stated "[y]es," but added "[a]nd then a bunch more from the diluting," possibly referencing the dilution of his BFG shares. [Id.]  Conflicting testimony is particularly inappropriate to resolve on summary judgment because resolution of the conflicts requires credibility determinations.  Because a material dispute of fact exists regarding the actual purpose of the Newfit Transaction, the entry of summary judgment under Section 5(a)(1) is precluded.

### E.  Claims Against Mr. Dixon

Defendants allege that the Trustee cannot sustain a claim against Dixon because "nowhere in MUFTA is there language that would call for liability against any person or entity other than the recipient of the transfer." [Dkt. 95 at 15].  To the contrary, MUFTA permits a judgment to be entered against "the first transferee of the asset or *the person for whose benefit the transfer was made*." Mass. Gen. Laws ch. 109A § 9(b)(1) (emphasis added).  Therefore, a person or entity other than the recipient of the transfer may be held liable under MUFTA if they are "the person for whose benefit the transfer was made." Id.

Defendants argue that "[t]he Trustee has submitted no evidence that judgment against Mr. Dixon is available as a remedy for his asserted MUFTA claims." [Dkt. 95 at 15].   In fact, the Trustee put forward substantial evidence of Dixon's benefit from the action, including his role in the numerous companies involved in this litigation, his central role in the Bally

19

Transaction,[8] and his statements about the Bally Transaction.  For these reasons, Dixon was "the person for whose benefit the transfer was made."  Therefore, Dixon can be held liable under MUFTA.

## IV.   CONCLUSION

For the foregoing reasons, the Trustee's Motion for Partial Summary Judgment [Dkt. 86] is **GRANTED IN PART** and **DENIED IN PART**.  The Trustee's Motion is granted as relates to the Bally Transaction.  The Trustee's Motion is denied as relates to the Newfit Transaction.

**SO ORDERED.**

Dated: August 6, 2026                                              /s/ Angel Kelley
                                                                   Hon. Angel Kelley
                                                                   United States District Judge

---

[8] Having held that summary judgment was inappropriate for the Newfit Transaction, the Court declines to discuss Dixon's liability as it relates to that transaction.